United States Courts
Southern District of Texas
FILED
OCT 16 2026
Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DIANA R. MILLER,** | ) | CASE NO. |
| Plaintiff, | ) | JUDGE: |
| v. | ) | |
| **AIRBNB, INC. a Delaware corporation,**<br>**DUEAN PHIKUNKAEW, an individual;**<br>**VARAT VITTHAYANUWAT, an individual;**<br>**WANG XUEWEN, an individual;**<br>**JIANG CHANGSEN, an individual; and**<br>**J.R., an individual.** | ) | |
| Defendants. | ). | **ORIGINAL COMPLAINT** |

Diana R. Miller ("Plaintiff"), a Texas resident, files this Original Complaint against the Defendants identified herein and states the following.

**TABLE OF CONTENTS**


- Introduction ........................................ 2
- Jurisdiction & Venue ........................................ 8
- Parties ........................................ 8
- Preservation of Evidence Notice ........................................ 11
- Fraudulent Concealment, Equittable Tolling, and Relation-Back........................................12
- Investigative Expense (Applicable to all Causes of Action)........................................14
- Factual Background ........................................ 14
- Causes of Action (I-XVII)........................................38

- Jury Demand........................................................ 50
- Prayer for Relief ................................................. 50
- Conclusion..........................................................53


## EXHIBITS

Exhibits attached to this complaint include:

**Exhibit A -** Letter dated September 10, 2026 from the U.S. Department of Justice, United States Office of Colorado, to Diana R. Miller.

**Exhibit B** - Verified Complaint for Forfeiture In Rem against cryptocurrency seized from Binance.com users Duean Phikunkaew, Varat Vitthayanuwat, Wang Xuewen and Jiang Chansen filed 9/29/23.

**Exhibit C** - Article by the Washington State Depatment of Financial Institutions entitled "Alleged crypocurrency exchange, Dubai International Digital Asset Exchange, dba DBEX, appears to be engaged in fraud".

**Exhibit D** - Summary setting forth estimate of income for off-broadway actor, such as J.R.

**Exhibit E -** Press Release No. 8850-24 on Diebex.com and Diebex.net 2022 scams using muli-tiered fraudulent scheme to target Asian-Americans.

## INTRODUCTION

In 2022, Plaintiff Diana R. Miller ("Plaintiff") fell victim to a sophisticated, targeted her in 2022, along with other victims. These allegations herein are based on information and belief as presently known to Plaintiff; although she has diligently attempted to verify the facts, the Enterprise operated through a highly coordinated and deceptive scheme behind the anonymity of

the internet making identities and details elusive. Further discovery is expected to reveal additional details and may necessitate substitution or addition of particular Defendants.

The DBEX enterprise was a multi-tiered international fraud organization operating through deceit, extortion, bribery, and money laundering. The Federal Bureau of Investigation (FBI) began investigating the cryptocurrency fraud scheme and determined it was operating out of Southeast Asia and China as its base, targeting victims in the United States. The Enterprise's Operators used social media platforms to meet victims and coax them into becoming interested in digital (cryptocurrency) investments. The victims were then introduced to fraudulent cryptocurrency platforms and directed to download applications, some of which had embedded malware. Relevant to this lawsuit, victims which included Plaintiff were instructed to deposit funds for trading in a fraudulent cryptocurrency platform "DBEX" (at "dbexbit.com") through **international money wires and or cryptocurrency transfers.**

Participants in the Enterprise are referred to herein as "Operator" or collectively as "Operators," functioning across multiple tiers.[1] **Tier 1 Domestic Operators** acted as front-end groomers, concealing their true identities while using their social-media personas to construct elaborate storylines designed to induce victims—typically women—to view them favorably. The Tier 1 Operator that groomed Plaintiff used emotional arcs to emotionally manipulate her while promising her future profits, success and relationship -- all to induce large-scale cryptocurrency transfers into "DBEX" (which was really their own cryptocurrency wallets). **Tier 2 and Tier 3 Operators**, primarily based in Asia, controlled the DBEX website, its cryptocurrency wallets, and

---

[1] This scam copies the basic format of the www.debiex.com and www.debiex.net scams in 2022 that targeted Asian victims which used a three-prong scam structure and U.S.-based social media platforms to solicit individuals to open fund trading accounts with Debiex, (2) "customer service" which purported to set up and service the accounts, and (3) "money mules" whose digital wallets accepted, misappropriated and laundered the funds. ***See* Exhibit E - CFTC article** (last visited 10/10/26).

the backend communications infrastructure. In addition, there may have been **an additional Tier 4 Operative** who alone and or with **Tiers 2 and 3**, manually controlled the website behind-the-scenes upon appointment to make it appear functional and as if it was a legitimate trading platform. The **Tier 1 Operative** set up appointment times to "trade" on DBEX based on whether a "node" was good (or not), which in reality appears to have used the availability of the Tier 3 or 4 Operator that programmed the DBEX trading platform.

Plaintiff's initial contact came from a **Tier 1 Operative pretending to be "Olafur"**, a purported businessman from Iceland residing in New York and seeking to rent an Airbnb room for an upcoming transfer to Houston. Upon information and belief, this individual was a Tier 1 Domestic Operative acting in concert with Tiers 2, 3 and if used then also a Tier 4. He was the "groomer" whose job was to induce Plaintiff to purchase USDT (Tether) cryptocurrency and transfer it to an "account" in the DEBIX platform (which was really only the wallets of individual Tier 2 and 3 Enterprise Operatives) under the pretext of trading was **guaranteed to result in "at least $1 million dollars" profit.**

**Plaintiff believes she has identified one Tier-1 Domestic Operative, an individual with initials "J.R." whose full name is specified below in the "Parties" section**. Plaintiff identifies this defendant as **"J.R."** for purposes of this pleading. Plaintiff will amend the complaint to confirm or substitute his true and or complete identity once confirmed through discovery. Until then, all statements herein are made in good faith on the best available information, and are protected by the litigation privilege under Texas and federal law. References to "Olafur" should be understood to reflect Plaintiff's present understanding based on information provided by "Olafur" through photographs, images and communications within the 397 single spaced (printed) pages of Whats App communications between "Olafur" and Plaintiff. "Olafur" is alleged to be an

Enterprise Operators participating in the fraud included the individual identified in this pleading as J.R.

Plaintiff alleges it is **highly plausible** that J.R. operated the "Olafur" persona because the behavioral, stylistic, and evidentiary markers of "Olafur" align directly with J.R.'s known communication patterns, aesthetic preferences and personal life. "Olafur" messages exhibit J.R.'s distinctive emotional tone, dramatic self-presentation, and characteristic use of artistic and anime-style references. The deployment of photographs which Plaintiff later determined were of J.R. further supports attribution. as does the sequence in which the initial Airbnb photo briefly appeared and was removed[2] — shows a pattern consistent with a primary actor experimenting with identity concealment rather than an unrelated third party. The inconsistencies and gaps displayed by lower-tier participants (**"Tiers 2 or 3"**) reinforce that they were not originators of the narrative but were peripheral actors lacking full organic storyline knowledge as had "Olafur", which is consistent with a **Tier-1 individual** (J.R.) controlling the core persona. Taken together, these facts create a **coherent, non-speculative inference that J.R. plausibly authored and controlled** the "Olafur" identity and story.[3]

**This is not a situation of classic stolen identity impersonation** -- like the 80 year old who believed Elon Musk had proposed to her over after meeting her on-line. The "Olafur" storyline is a fabricated persona constructed from elements of J.R's real life, including personal experiences and photographs. The most rational inference is that the "Olafur" so believes in his

---

[2] "Olafur" had a nondescript picture of himself when younger lounging on a deck with water, boyfriend in rear. When Plaintiff challenged him that it looked very young, and after he had "hooked" plaintiff into conmunications, he removed the photo and replaced it with a scene of Northern Lights from Iceland
.

[3] Plaintiff acknowledges that another individual may have impersonated J.R. or used his publicly available photographs. Airbnb's failure to require identity verification for inquiries, its failure to warn Plaintiff that "Olafur" was entirely unverified, and its refusal to provide identifying information after the theft renders it extremely difficult—if not prevented—Plaintiff from discovering the true identity of the wrongdoer at the time. Discovery is anticipated to shed further information as to "Olafur's" true and complete identity(s).

own attractiveness, charm, and invincibility, and knew the photos he sent could not be traced back to him through public tools, that he used them to pull Plaintiff in. These photographs did not appear in any reverse-image search[4], indicating they were sourced from **private media**, further supporting the inference that the wrongdoer had access to J.R.'s personal content and deliberately incorporated it into the fraudulent narrative.

"Olafur" was a hand-crafted persona, not the typical identity-assumption script used by overseas scammers. Unlike the stock narrative fed to "Victim 1" in the DBEX scheme—where she was approached by "King Chen Yu," a supposed Chinese cryptocurrency trader—this was not a recycled storyline. "Olafur's" character was performed with the polish and emotional nuance of a trained Meisner actor. ***See*** **"D. Other Victims", Factual Summary**, below.

The Enterprise concealed its actors. However, based on the evidence available, J.R. is plausibly connected to the Olafur persona, but discovery is required to confirm the full identity. **This one thing is certain**: "Olafur" is capable of spontaneously generating elaborate storylines while maintaining intense focus on his victim and creating a sense of genuine emotional connection. Thus, an individual who studied psychology and drama would be particularly adept at truthful, spontaneous reactions and deep interpersonal engagement—and particularly well-suited to this type of improvisational manipulation. In fact, Defendant J.R. studied psychology and drama at Boston College -- and this alignment is noteworthy.

Plaintiff seeks recovery for the full scope of damages caused by Defendants' fraudulent scheme and related misconduct, including $132,000 in lost savings, the $1,000,000 investment return repeatedly guaranteed by "Olafur", compensation for the extensive emotional,

---

[4] Except one: a photo labeled "Jared's feet" posted on a third-party website taken from waist down of Jared's feet while he reclined at his mother's Tennessee home. This is how Plaintiff, after arduous search, identified J.R.

psychological and harm to health she has experienced as a result of work required to remedy her financial loss and the stress caused by the fraud, medical and travel expenses associated with the resurgence of Plaintiff's cancer, lost income exceeding $220,000 per year, and other related damages. Plaintiff further seeks treble damages under RICO and the Texas DTPA, exemplary (punitive) damages under Texas law up to the statutory maximum of $4,750,000[5], attorney's fees and costs, pre- and post-judgment interest, and equitable relief including asset tracing and restitution, and any additional relief permitted by federal or Texas law.




[5] Texas exemplary damages cap: $(2 \times \text{economic damages}) + 750{,}000$; $(2, \times, 1037000) + 750{,}000 = 2{,}074{,}000 + 750{,}000 = 2{,}824{,}000$; **$2M economic**, which yields the **maximum cap** of $(2, \times, 2000000) + 750{,}000 = \mathbf{4,750,000}$.

The above shows a screenshot of the DBEX trading platform application which Plaintiff downloaded upon instruction from "Olafur":

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d). The Court also has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

Venue is proper in the Southern District of Texas, Houston Division under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, and Plaintiff resides in this District.

## PARTIES

**Plaintiff** is an individual residing in the greater Houston, Texas area, just as she was at the time she fell victim to the Enterprise scam.

**Defendant Airbnb, Inc.** is a Delaware corporation with its principal place of business located at **888 Brannan Street, San Francisco, California 94103**. Airbnb, Inc. operates a global online platform that facilitates lodging, short-term rentals, and related services. Airbnb, Inc. may be served with process through its corporate headquarters at **888 Brannan Street, San Francisco, CA 94103**, or through its registered agent for service of process in Delaware once identified in discovery. **Airbnb conducts substantial business in Texas**, purposefully avails itself of the Texas market, and maintains continuous and systematic contacts with the State of Texas sufficient to establish personal jurisdiction.

**Tier 1 Domestic Operative, No. 1:** Upon information and belief, **"J.R."** is the Enterprise's' Tier 1 Domestic Operative No. 1. Defendant J.R. is an individual residing in New York County, New York. Paintiff cannot yet ascertain the true identity of this defendant because "Olafur" used da false identity, concealed his identity, but it is **highly plausible** that "J.R." may have impersonated "Olafur" to defraud Plaintiff.

However, while the fact that other WhatsApp images were either private, unindexed, or not publicly available supports the **plausible inference** that "Olafur" was, in fact, J.R. or someone in his close circle of friends who felt emboldened to use photographs of J.R.'s identity, this remains to be confirmed (or not confirmed) in discovery. Therefore Plaintiff will provide Defendant "J.R."'s full name and last known residential address of "J.R." to the Clerk under seal for purposes of service. Plaintiff provides Defendant's last known address solely for service of process and requests that it be maintained under seal to protect privacy and avoid unnecessary disclosure, until further identification.

Airbnb's failure to require or provide any identifying information for the individual using the alias "Olafur" directly contributes to the fact that Plaintiff cannot, as of today, definitively identify **J.R.** as the perpetrator. Because Airbnb allowed "Olafur" to initiate contact without submitting government-issued identification, and later informed Plaintiff that it possessed no verifiable identity information for him, Plaintiff was deprived of the very facts necessary to confirm whether the individual behind the WhatsApp communications was J.R. or someone impersonating him. This omission is the reason Plaintiff only alleges a **highly plausible inference**—supported by photographic evidence—and cannot definitely establish identity prior to discovery.

**Tier 2-4 Operatives Duean Phikunkaew, Varat Vitthayanuwat, Wang Xuewen and Jiang Changesen were part of the Enterprise and, based on information and belief gained from the U.S. Attorney of Colorado, are residents of China and or Thailand.** These individuals whose identities will confirmed and or established through discovery, because except for Varat Vitthayanuwat their addresses are currently unknown.

**Varat Vitthayanuwat has submitted an address** in the referenced forfeiture case ***United States of America v. 12,324.84 USDT Seized from Binance.com is:*** **18/1-2 Rama 6 New Road, Soi 4, Rong Mueang Subdistrict, Pathumwan District, 66915146274, Bangkok 10330 Thailand.**

There are actually **six individuals that held Binance.com accounts directly linked to the DBEX fraud**, but only the four referenced above evidently have been sued in a forfeiture action by the U.S. Attorney's Office. ***See below*** **"D. Other Victims".** Plaintiff will attempt to identify the addresses of all five unidentified Operativeshrough public records requests and discovery. **See Exhibit B -** ***United States of America v. 12,324.84 USDT Seized from Binance.com*****, Action No. 1:23-cv-02549-SBP, Verified Complaint for Forfeiture** ***In Rem*** **¶¶ 34-73.**

**Varat Vitthayanuwat**'s self-disclosed address Research indicates this is also the location of Silicon Data Company Limited (website: www.silicon.co.th) with managing director Sophon Vitthayanuwat.

**Defendant Airbnb, Inc.** ("Airbnb") is a California corporation doing business in Texas. Airbnb's **service address is: Airbnb, Inc., 888 Brannan Street, San Francisco, CA 94103.**

## PRESERVATION OF EVIDENCE NOTICE

Defendants, and any family members, agents, or associates acting in concert with Defendants, are hereby placed on notice of their legal duty to preserve all evidence relevant to

the claims and defenses in this action from **March 11, 2020 to the present**[6]. This duty includes the preservation of all forms of electronically stored information ("ESI") and tangible materials, including but not limited to:

- **Social media content** of every kind, including posts, comments, captions, photographs, videos, reels, stories, highlights, private messages, direct messages, archived content, deleted content, and account activity logs from any platform (including Instagram, Facebook, TikTok, Twitter/X, Snapchat, WhatsApp, Telegram, Signal, and any other messaging or social-media applications).
- **All associated metadata**, including timestamps, geolocation data, edit history, deletion logs, and device identifiers.
- **Digital files** stored on any computer, laptop, tablet, mobile device, external drive, USB device, SD card, or cloud-based storage system.
- **Communications**, including emails, text messages, chat logs, messaging-app communications, and any other electronic correspondence.
- **Financial records**, including bank statements, wire records, cryptocurrency trading records, fiat trading records, exchange logs, wallet addresses, transaction histories, blockchain transfers, and any related materials.
- **Limited liability company records**, including formation documents, operating agreements, membership records, asset-holding records, transfer records, and any documentation reflecting the holding or movement of assets.
- All records, communications, data, ***anything related to*** use of the fraudulent trading application DBEX or www.dbexbit.com.

[6] Start of the global pandemic.

- **Identity-verification materials**, including photographs, scans, government-issued identification, platform verification submissions, and any materials used to create, verify, or operate online accounts.
- **Platform activity logs**, including login records, IP logs, device logs, authentication logs, and any other data stored by third-party platforms.
- **Any other data** stored on computers, servers, mobile devices, cloud accounts, removable media, or third-party platforms that may be relevant to this dispute.

Defendants must take **immediate steps** to suspend any deletion, editing, overwriting, auto-delete settings, archiving, purging, or concealment of any such evidence. This includes disabling auto-delete functions on social-media platforms, messaging applications, and email systems, and preserving all devices used to access relevant accounts.

Failure to preserve evidence may result in sanctions under **Federal Rule of Civil Procedure 37(e)** and applicable Texas law, including adverse-inference instructions, monetary sanctions, contempt findings, evidentiary penalties, or other remedies authorized by the Court.

## FRAUDULENT CONCEALMENT,<br>EQUITABLE TOLLING, DISCOVERY RULE AND RELATION-BACK

Plaintiff **invokes the doctrines of fraudulent concealment and equitable tolling as to all Defendants in this litigation**, as recognized under Texas and federal law. Under *Borderlon v. Peck*, 661 S.W.2d 907 (Tex. 1983), and *S.V. v. R.V.*, 933 S.W.2d 1 (Tex. 1996). a defendant who conceals material facts cannot rely on limitations until the plaintiff discovers the fraud. The statute of limitations is deferred when an injury is **inherently undiscoverable** and not **objectively verifiable**, as articulated by the Texas Supreme Court in *Computer Associates v. Altai*, 918 S.W.2d 453 (Tex. 1995).

**As to Airbnb alone, Airbnb** failed to disclose that "Olafur" had provided no government-issued identification, failed to warn that inquiries could be made anonymously, and affirmatively represented its platform as safe and supported by identity-verification tools. These omissions prevented Plaintiff from discovering the risk and the deception at the time of the incident. Airbnb may not benefit from a limitations period where its own conduct prevented Plaintiff from discovering the wrongdoing or from having the ability to pursue her claims.

**Airbnb's** concealed verification failures, anonymous-inquiry practices, and strict government ID process for reservation guests created a false impression for hosts that all inquiries were safe and those inquiring were adequately vetted. Plaintiff could not have reasonably known at the time "Olafur" made contact that he was not, in fact, properly vetted by Airbnb. The true nature of Airbnb's omissions could not have been detected through reasonable diligence and is now objectively verifiable through platform records, verification logs, and post-incident policy changes. Plaintiff did not discover Airbnb's wrongful conduct until **after October 2022**, and accrual is therefore deferred until that date.

The **Enterprise Defendants** affirmatively concealed their identities through deliberate anonymity, fabricated personas, encrypted communication channels, and coordinated misdirection. Their concealment prevented Plaintiff from discovering their roles within the Enterprise despite reasonable diligence. Limitations are therefore tolled as to Enterprise Defendants until further discovery to further identify and confirm identities of the responsible actor(s). Any amendment adding or substituting Enterprise Defendants shall **relate back under Fed. R. Civ. P. 15(c)(1)(A)&(B), allowed by Tex. Civ. Prac. & Rem. Code §16.068.** Both Texas and federal law recognize that concealment of the identity of the wrongdoer—even without concealment of the underlying fraud—is sufficient to toll limitations.

Plaintiff also asserts **federal claims under RICO**, for which federal equitable tolling and federal fraudulent-concealment principles apply. Both Texas and federal law recognize that concealment of the identity of the wrongdoer—even without concealing the underlying fraud—tolls limitations. Fraudulent concealment does not require hiding the fraud itself; it applies when a defendant's conduct prevents the plaintiff from discovering the facts necessary to sue, including the identity of the responsible party. Texas courts consistently hold that concealment of identity tolls limitations when the plaintiff, despite diligence, cannot determine who caused the injury. See *S.V. v. R.V.*, 933 S.W.2d 1 (Tex. 1996) (fraudulent concealment applies when a defendant's conduct prevents discovery of the injury or the identity of the wrongdoer despite due diligence).

Because this action is brought under diversity jurisdiction, Texas statutes of limitations and Texas tolling doctrines govern all state-law claims. Under *Erie*, tolling rules are substantive, and Texas law controls fraudulent concealment, the discovery rule, and equitable tolling.

## INVESTIGATIVE EXPENSES APPLICABLE TO ALL CLAIMS (All Causes of Action, All Defendants)

As a direct and proximate result of Defendants' concealment, **Plaintiff must undertake extensive independent investigative efforts to identify the Enterprise participants and trace the stolen DBEX deposits.** The U.S. Attorney's Office possesses victim-specific information but cannot disclose confidential investigative materials pertaining to investigations involving hundreds of victims, **making private blockchain tracing necessary for purposes of this litigation**. **Plaintiff seeks recovery of all reasonable and necessary investigative expenses, including blockchain-tracing and forensic-analysis costs.** These expenses constitute economic damages under the Texas DTPA, consequential damages under Texas fraud law, recoverable

investigation costs under federal RICO, and actual damages under the Texas Theft Liability Act. This tolling and damages framework applies to all causes of action asserted herein.

## FACTUAL BACKGROUND

### A. Overview of the Criminal Cryptocurrency Enterprise: a RICO Conspiracy

The DBEX Enterprise constitutes fraud and a pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The DBEX platform purported to offer digital asset (cryptocurrency) trading. Victims, including Plaintiff, were instructed to transfer funds to a legitimate cryptocurrency trading platform such as Coinbase.com, purchase Tether (USDT), and then send the cryptocurrency to a DBEX deposit address. The DBEX website mimicked a functioning trading platform, but all deposits actually went to wallets controlled by the Enterprise, laundered, and distributed among its participants.

**Cryptocurrencies are digital tokens of value** circulated over the Internet as substitutes for traditional fiat currency. Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of alphanumeric characters. A virtual currency wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. A virtual currency wallet also allows users to send and receive virtual currencies. Multiple addresses can be stored in a wallet. The blockchain is essentially a distributed public ledger containing an immutable and historical record of every transaction utilizing that blockchain's technology. It also maintains records of every transaction and all the known balances for each virtual currency address.

**Tether (USDT) is a blockchain-based cryptocurrency** whose tokens in circulation are backed by an equivalent amount of U.S. dollars, making it what is known as a "stablecoin". USDT

is issued by Tether Ltd., a company headquatered in Hon King. Tether is a subsidiary of Bitfinex, a crypto currency exchange registered in the British Virgin Islands. USDT is hosted on the Ethereum blockchain, among others. Like other virtual currencies, USDT is sent to and received from USDT addresses. USDT is somewhat analogous to a bank account number, and is represented as a 26-to-35 characterlong, case-sensitive string of letters and numbers. Users can operate multiple USDT addresses at any given time,, with the possibility of using a unique USDT address for every transaction.

Although the identify of an address owner is generally anonymous, analysis of the blockchain can often be used to identify the owner of a particular address. This analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity.

Cryptocurrency exchanges are companies that exchange Bitcoin and other cryptocurrencies, including fiat, like Coinbase.com.

The Enterprise's mission was to identify potential victims, usually female, through social media platforms and convince them to transfer assets into the fake DBEX cryptocurrency platform where the Operators would keep (steal) the cryptocurrency (in this case USDT) as their own. They would then manipulate the female targets through romantic imagery, as follows. Plaintiff has a hard time accepting that she could succumb to such a scam, however believes it was in part due to the long hours she was working, isolated and alone, during and post-COVID. This has been part of her post-scam trauma -- thinking she was so duped that evil can be crouching at every door. In fact, she is still concerned for her physical safety in light of this criminal Enterprise comprised of soul-less human beings, and is glad she obtained her **open carry license just in case.**

Below is an example of the messages sent by "Olafur" — plainly written by a native English speaker with a gentle, educated manner, yet operating with profoundly corrupt intent. The

depth of the deception is evident: he thanks Plaintiff for being in his life while simultaneously planning to take the very resources she needed to survive:




And while the intentional broken English was often interjected, most time "Olafur" was emoting in perfect English, as follows:




The Enterprise operated as a multi-tiered international fraud scheme, functioning in part as an Advance Fee Fraud. After victims transferred USDT into what they believed were DBEX trading accounts, they were told additional taxes or investments were required before withdrawals could be processed. Some victims advanced more funds; others, including Plaintiff, refused. Minimal withdrawals were occasionally permitted to reinforce the illusion of legitimacy. Ultimately, access to accounts was denied and victims lost most or all of the money they believed

was invested in cryptocurrency trading. No funds were ever placed into legitimate investment accounts; instead, they were diverted into individual theft wallets controlled by Tier 2, Tier 3, or Tier 4 Operators.

Artificial intelligence analysis of "Olafur's" WhatsApp communications revealed distinct shifts in writing style, tone, grammar, and cultural references, indicating that native English-speaking groomers handed off communications to Asian ESL Operators and vice-versa -- particularly necessary due to time zone differences. ESL Operators displayed clear Asian linguistic patterns, while native English Operators communicated with natural syntax and lexicon, deviating only when attempting to insert artificial broken-English comments. Plaintiff often took the native speaker(s) off script, prompting authentic English responses.

As explained above, this was a multi-layered scheme. **"Tier 1" solicitors** contacted victims through U.S.-based social media platforms and pretended to befriend or romance them; **"Tier 2"** customer-service actors who purported to set up and manage DBEX accounts; and **"Tier 3"** money mules whose digital wallets received and misappropriated victim funds. Additionally, there may have been a **separate "master mind" (Tier 4) behind the DBEX website** itself. No actual trading occurred and all deposits were pocketed, laundered, and distributed by the Operators. See Exhibit E - CFTC Press Release No. 8850-24 (last visited 10/12/26).

Acting jointly, these operatives groomed, manipulated, and deceived victims, including Plaintiff to induce her to liquidate assets for the purpose of cryptocurrency trading on the DBEX platform. Plaintiff was told to purchase Tether (USDT) cryptocurrency through Coinbase.com, then open a purported account on [fake] DBEX trading platform. DBEX displayed a scan code linked to the Operators' personal wallets, so when victims believed they were transferring USDT into a trading account from Coinbase.com or other exchanges the USDT was really being sent to

cryptocurrency wallets controlled by the scammers. The scheme's monetary success was aided by indicia of legitimacy: use of reputable exchanges such as Coinbase.com and a downloadable platform that functioned like a commercial trading application. These features concealed the fact that all transferred funds were immediately diverted into theft wallets controlled by members of the Enterprise.

After the transfers occurred, the cryptocurrency website, platform, or application would appear to reflect the victims' deposits by providing an account statement. To gain the victims' trust, the fraudulent websites or applications simulated real-life trades (which were, in Plaintiff's and at least one other victim's case, facilitated by "Olafur" a Tier-1 Domestic Operative) and reflected impressive financial gains in the victims' accounts, leading victims to invest additional funds at the behest of the scammers. Some victims, including Plaintiff, were allowed to withdraw small amounts of the apparent profits to establish the legitimacy of the fraudulent DBEX cryptocurrency platform. Ultimately, when victims (including Plaintiff) wanted to withdraw their funds, they were told that they were unable to do so and given various excuses for this, as the Operative attempted to induce the victim to deposit further proceeds for taxes and or release of the full amount of the "deposits", i.e., the funds that had gone directly to the scammers digital wallets. "Funds" in Plaintiffs' case means the Tether USDT that Plaintiff was instructed to purchase through Coinbase.com and send directly to what she was told was her DBEX account -- which was, in reality the wallets of Operatives in the Enterprise. ***See*** **Exhibit** B - **the forfeiture case *United States of America v. 12,324.84 USDT Seized from Binance.com*, Action No. 1:23-cv-02549-SBP, Verified Complaint for Forfeiture *In Rem* against defendants Duean Phikunaew, Varat Vitthayanuwat, Wang Xuewen and Jiang Changesen, pages 7-10, ¶¶ 18-35.**

Once victims stopped depositing funds, Defendants deployed scripted delay tactics—promised travel, imminent meetings, and other fabricated explanations—to buy time while Tier 2-3 actors laundered stolen funds through offshore wallets. These delays prevented victims from promptly reporting the fraud to Coinbase or other institutions that might have frozen receiving wallets. In Plaintiff's case, Tier 1 actor that Plaintiff shall refer to as "J.R." appears to have celebrated the scheme's success by traveling to the Caribbean and engaging in luxury expenditures, while Plaintiff waited for "Olafur" to arrive in Houston and explain what had happened to her remaining life savings, following her prior devastating loss of her home in Hurricane Harvey.

Throughout Plaintiff's interactions, Operators scheduled specific appointment times for **"nodes,"** which they represented as optimal trading opportunities. Retroactive analysis shows these **"nodes" were simply time windows during which Tier 3 or Tier 4 Operators manually simulated trades and profit increases after Plaintiff transferred funds from Coinbase to the DBEX platform**. The platform displayed dynamic buying and selling activity and profit increases after each purported round of trading. The scheme appeared further legitimate because Operators never requested Plaintiff's ID or password; instead, victims were instructed to purchase USDT through Coinbase and transfer it to DBEX, which in reality were Tier 2 scammer wallets.

Plaintiff's DBEX account displayed significant "profits" during these so-called nodes, despite the absence of any real trading activity. These fabricated gains manipulated Plaintiff's perception of success, increased her emotional and financial investment, and facilitated the transfer of substantial funds into Operators' wallets later identified in U.S. federal forfeiture proceedings. The **Enterprise's use of "node" terminology is direct evidence of coordinated fraud,**

**intentional misrepresentation, and the existence of a structured criminal enterprise operating across multiple jurisdictions.**

By letter dated September 10, 2026, the U.S. Department of Justice, Colorado Division, advised Plaintiff that she had been identified as a potential victim in a fraudulent scam involving the DBEX platform. The DOJ is currently ensuring that Plaintiff's loss is associated with recovered funds. **See Exhibit B (dated September 10, 2026) DOJ letter to Diana Miller**.

## B. Airbnb's Liability for Failure to Provide Adequate Warnings or Identity Verification

In 2022, Airbnb failed to implement reasonable identity-verification safeguards or provide adequate warnings to users regarding the risks of interacting with individual inquiries on its platfor or the fact that those inquiring were not held to the same identification standards as individuals were required to provide once they requested their reservation.

In June 2022, when Plaintiff was contacted through Airbnb by an individual using the name "Olafur," Airbnb did not require government-issued identification for user inquiries and did not disclose to Plaintiff that "Olafur" had provided no verified identity information. Plaintiff attempted to vet "Olafur" by sending her phone number and requesting a direct call; instead, he contacted her through WhatsApp, a communication method outside Airbnb's platform and beyond any safety measures Airbnb represented it maintained. Airbnb never warned Plaintiff that "Olafur" had provided no verified identity information. Airbnb failed to adequately warn Plaintiff that inquiries could be made by individuals who had not submitted any government identification, nor did it advise her of the heightened risks associated with interacting with unverified users.

After the theft occurred, Plaintiff contacted Airbnb multiple times to report the incident and to request the identity information associated with "Olafur." Airbnb informed Plaintiff that it did not possess a government-issued identification for "Olafur" because such verification was not

required for inquiries unless and until a reservation was made. Airbnb's failure to require identity verification for inquiries, combined with its failure to adequately warn Plaintiff of this policy, if at all, created a foreseeable and unreasonable risk of harm by enabling criminal actors to initiate contact with users under false identities. Airbnb's protections were materially weaker before late 2022, than at present. Inquiries could be made without government ID, and criminal actors could contact users with minimal friction. Airbnb later upgraded its identity-verification requirements in late 2022 and again in June 2023[7], ultimately mandating government-issued ID verification for all guests and hosts—demonstrating that stronger protections were feasible and that Airbnb's earlier policies were materially inadequate. This all shows that Airbnb couldl have implemented stronger protections, earlier.

Plaintiff acknowledges that Airbnb's subsequent safety upgrades, including the implementation of mandatory global identity verification in 2023, cannot be used to prove negligence under Rule 407. However, these measures are relevant and admissible for permissible purposes, including impeachment, demonstrating the feasibility of precautionary measures, and rebutting any claim by Airbnb that stronger identity-verification or warning protocols were impossible or impractical at the time of Plaintiff's injury.

**Airbnb's omissions were a producing and proximate cause of all damages** suffered by Plaintiff. By permitting anonymous individuals to initiate inquiries without verified identification, failing to disclose that "Olafur" had provided no government-issued ID, and representing its platform as safe and vetted, Airbnb created the conditions that enabled the fraudulent scheme to occur. It was reasonably foreseeable that allowing unverified actors to contact users while

---

[7] Iin late-2022 -- Airbnb expanded its mandatory ID verification. In June 2023 it instituted a requirement of global mandatory ID verification and enhanced fraud-prevention protocols, with stronger identity-matching tools. Only in June 2023 did Airbnb eventually require people who were only "inquiring" to provide government ID even if they never booked. This all happened after Plaintiff's fraud incident.

withholding that lack of verification would expose users to significant financial and emotional harm. Airbnb's failure to exercise due diligence in vetting inquirers directly facilitated Plaintiff's reliance on the perpetrator's misrepresentations and prevented Plaintiff from discovering the deception or identifying the perpetrator, thereby contributing to the full extent of Plaintiff's losses.

## B. "Olafur" - Initial Contact and Grooming

On June 27, 2022 Plaintiff was contacted by "Olafur" an alleged businessman from Iceland inquiring into a Airbnb stay for July 14 - September 13, 2022. Unknown to Plaintiff, "Olafur" was envolved in a criminal enterprise consisting of Tier 1 and Tier 2 actors that engaged victims through sustained, emotionally manipulative communications designed to create a fabricated relationship of trust and reliance. Although "Olafur Jonson" never rented from Plaintiff, he repeatedly promoted DBEX as a high-yield cryptocurrency investment platform and encouraged Plaintiff to invest with "him". Acting in concert, Tier 1 domestic operative and Tier 2 Asian operative(s), "Olafur" induced Plaintiff to transfer what remained of her life savings (after she lost her home in Houston's Hurricane Harvey) through Coinbase, convert those funds into Tether (USDT), and deposit the cryptocurrency into DBEX-controlled wallets. According to the United States Department of Justice, the broader criminal enterprise is believed to be a $33-million fraud operation based in Asia. After Plaintiff's funds were transferred, Tier 2 Defendants laundered the proceeds through offshore wallets and distributed portions of the stolen funds to Tier 1 Domestic Actor Defendants. At least two other victims have been identified by the U.S. Attorney's Office in Colorado and the Department of Financial Institutions in Washington state. *See below for further detail.*

The enterprise relied on scripted personas tailored to different victims. One victim was approached through her Airbnb rental using a more typical scammer script—that of an "Asian

businessman."[8] Plaintiff, by contrast, was targeted by an alleged Icelandic businessman named "Olafur Johnson." Plaintiff's script was more intricately constructed, crafted by a Tier 1 domestic actor who is himself a trained performer. Post-fraud analysis shows that communications were shared and handed off between Tier 1 domestic actors and Tier 2 Asian actors, as the messaging abruptly shifted from native Chinese syntax patterns to American vernacular and contrived foreign "accents."

On June 26, 2022 "Olafur" initiated contact with Plaintiff through an Airbnb inquiry about a pre-approval for 2 guests for July 14 - September 13, 2022. Plaintiff would sometimes give her direct mobile number to vet potential guests, and did so with "Olafur" that same day. Olafur then requested they communicate through Whats App (purportedly due to his inadequacy with English). On June 26, 2022 at 3:48 p.m., Plaintiff received her first communication from "Olafur" through Whats App. Saying "Hi, I'm Olafur". This started communications that ended October 11, 2022 when "Olafur" delaying arrival, eventually promising he would arrive Texas October 17 or 18, 2022.

On June 27, 2022 Defendant J.R. posted on his Instagram a photo of himself in his New York apartment, standing over his laptop, holding up a "V" sign, as if signaling a victory to those who would follow his Instagram account. See below:

[8] *See* United States v. 12,324.84 USDT Seized from Binance.com User ID #2974 in the Name of Ducan Phikunkaew et al., No. 1:23-cv-02549-SBP (D. Colo. filed 2023). All defendnats in this action are: Duean Phikunkaew, Varat Vitthayanuwat, Wang Xuewen, and Jian Changsen.




So what was the **motive? Financial stress** resulting from the COVID-lockdown would be the most obvious[9]. J.R.'s social media indicate he was experiencing this pressure as probably most New York actors during that time. Despite the near-total shutdown of acting work in October 2022—while the Enterprise was winding down its operation against Plaintiff and she was being transitioned to an Asian Tier-2-4 Operative (to allow the Enterprise time to launder her funds)—J.R. traveled with (took?) his family to the **Bahamas then traveled to a vacation volley ball trip presumably in Turks and Caicos.** Average cost for such a family would be app. $11,200-$14,900[10]. Soon thereafter, he and his partner posted a volleyball vacation, most probably in Turks & Caicos, average cost in 2022 was $4,200-$6,060[11].

---

[9] On March 11, 2020 the World Health Organization declared COVID-19 a global pandemic. On March 22, 2022New York issues its statewide "PAUSE" lockdown order. Broadway only returned in full operational capacity in September 2021 following an 18 month shutdown.

[10] Estimate for three adults with children travel RT from Tennessee, two adults RT from New York, Oct. 2022.

[11] Estimate based on two adults RT travel from NY.

As an intermittently employed actor residing in New York City, such expenditures are inconsistent with the economic realities of the period. These depictions support Plaintiff's belief that J.R. benefited financially by participating in the Enterprise.

However, to ascertain ***J.R.'s motive*** one need not look further than J.R.'s monologue posted in 2021 to realize he also pursues the risk and thrill of it all. On or about October 22, 2021, J.R. published a video monologue wherein he expressly states: ***"You seem to be operating out of the assumption I do this because I like being bad. No, no. I mean, I steal for the crime, for the drama, for the fashion. I steal for the moment."*** Ironically, this fits with "Olafur's" prophetic moralization in chat that **"…sometimes people just have to lose their soul for some material satisfaction.."** *See* What's App chat, P-100, p. 227.

A still image from that video appears directly below.



Further, J.R. fits the "Olafur" persona in many other ways, with multiple indicia throughout the Whats App chat (printed it totals 397 pages, single space) and image exchange that point directly to his involvement. Here are some examples:

a. "Olafur" sent Plaintiff an American pop-song video on August 28, 2022—Daniel Powter's "Free Loop." Powter's hit was released in 2005 and circulated heavily between 2006 and 2009 on early-social-media platforms such as YouTube and MySpace. Defendant **J.R., born in 1994, was 11 to 15 years old during the song's peak popularity**, which is a developmental period when adolescents form strong emotional and identity-shaping associations with music. "Free Loop," with its introspective tone and themes of personal struggle, was widely consumed by American teens during that era and would have been part of the cultural environment J.R. grew up in. The selection of this specific mid-2000s American pop song strongly suggests personal familiarity rather than random choice, and is probative of the operative's true identity as an American male of J.R.'s age cohort rather than a foreign scammer.

b. "Olafur" liked to talk New York locations and activities, sounding authentically like a New York City working artist and professional. He chatted about fishing in the Hudson River, attending wine auctions, and **Issey Miyake** --an upscale clothing designer favorite among gay men, actors, dancer, models and New York creatives and men in their 20s-40s who liked minimalist sculptural fashion.

c. He sent random videos and images completely unrelated to the "Olafur" character. On July 14, 2022,, he sent a picture attending a small intimate jazz performance in a local New York venue (they never include him, per se).

d. He is an avid sports enthusiast (his father played professional NFL football, after all), and he is frequently surrounded by an LGBTQ social entourage. He talks of golfing and

sent Plaintiff a video golfing at a club, which Plaintiff has tracked to a Santa Ana, California golf course -- this would have been during one of his many California travels.

e. He showed particular interest in a painting by JuliAnne Jonker's painting "The Gift" (2020) which was exhibited at the Salmagundi Club in New York City in January 10-28, 2022, and was acquired shortly after the fraud. (Plaintiff intends to subpoena information on the purchaser).

f. He spoke of Hayao Miyasaki, the Japanese animator, filmmaker and manga artist regarded as one of the greatest filmmakers in the history of animation. An artificial intelligence search indicates the average current age of anime fans is under 35 years old, J.R. is 32 years old.

g. Olafur claimed to have "lost" his Cinderella in a car crash. However, the story-line tracked more with what would obviously be a traumatic break-up with his high school sweetheart.

h. "Olafur" chatted about his only brother that he would fight with growing up, which would have been modeled after J.R.'s only sister. Further, he mentioned his brother managed hotels, which in fact would have been his brother-in-law.

i. One of the most striking indicia of J.R.'s potential involvement was when one of his friends sent him a chat message believing he was in another chat instead of Plaintiff's. The friend messsaged to the effect: "I've been waiting for you a half hour and you are still in your makeup!" Who, other than an actor, would be in makeup needing to take it off for a normal life meetup? Plaintiff has identified an empty hotel restaurant lobby in another photo sent to Plaintiff, and she surmises it may have been the location from which his friend was waiting for him to remove his makeup!

j. Another potentially relevant detail is that J.R. formed a limited liability company before the fraud, despite having no identifiable assets or legitimate business activity that would warrant an entity typically used to hold or protect assets. His social media presence during the post-COVID period reflects a search for work rather than the accumulation of property or income, and **Exhibit D's estimated earnings from his Off-Broadway involvement between 2020 and 2022** further confirm that his income level did not support any asset-holding purpose for an LLC. This discrepancy raises a reasonable question as to why the LLC was created at all and whether its true purpose was unrelated to legitimate business operations.

Plaintiff believes these communications were spontaneous, and gave glimpses into "Olafur's" real life. Discovery will shed further light on them.

## C. The Fake DBEX Trading Platform: "Olafur" Induces Plaintiff to Transfer Funds

Following "Olafur's" instructions, Plaintiff transferred approximately $150,000 through Coinbase, converted the funds into Tether (USDT), and deposited the cryptocurrency into the DBEXIT wallet. Plaintiff's transfers of Tether (USDT) from Coinbase to the "DBEX" address and related charges, after her one allowed refund, total $132,060 and were as follows:

### 1. JULY 2022: $7,000.00

| ransaction | Fees | Subtotal | Total [1] | Notes |
|---|---|---|---|---|
| $0.999995 | $0.00 | -$4890.80362 | -$4890.80362 | Sent 4890.828073 USDT to 0xB7953a72b8e00aC17af6E545C5966A39c93370d4 (to 0xB79...370d4) |
| $1.000045 | $74.35 | $4891.04730 | $4990.00 | Bought 4890.827209 USDT for 4990 USD using Cash (USD) |
| $1.00 | $10.00 | $4990.00 | $5000.00 | Deposit from Veritex Community Bank:****7832 |
| $0.999235 | $0.00 | -$1950.85 | -$1950.85 | Sent 1952.343543 USDT to 0xB7953a72b8e00aC17af6E545C5966A39c93370d4 (to 0xB79...370d4) |
| $0.999075 | $29.65 | $1950.53849 | $1990.00 | Bought 1952.344407 USDT for 1990 USD using Cash (USD) |
| $1.00 | $10.00 | $1990.00 | $2000.00 | Deposit from Veritex Community Bank:****7832 |

**2. AUGUST 2022: $123,000.00 less $5,940 received from external account = $117,058.66.**

| nsaction | Fees | Subtotal | Total [1] | Notes |
|---|---|---|---|---|
| $1.00 | -$25.00 | $5854.45 | $5829.45 | Withdrawal to Veritex Community Bank:****7832 |
| $1.00027 | $58.38 | $5911.95 | $5823.86 | Sold 5940 USDT for 5823.86 USD |
| 1.000225 | $0.00 | $5941.33650 | $5941.33650 | Received 5940 USDT from an external account |
| $1.00004 | $0.00 | -$100945.14452 | -$100945.14452 | Sent 100941.106873 USDT to 0x0Ee4F8E92C23572f7a94Ff9981EAFCbe02d57274 (to 0x0Ee...57274) |
| 1.000015 | $1511.57 | $100942.62099 | $102959.41 | Bought 100941.106873 USDT for 102959.41 USD using Cash (USD) |
| $1.00 | $10.00 | $102990.00 | $103000.00 | Deposit from Veritex Community Bank:****7832 |
| 1.000295 | $0.00 | -$19595.74669 | -$19595.74669 | Sent 19589.967654 USDT to 0x0Ee4F8E92C23572f7a94Ff9981EAFCbe02d57274 (to 0x0Ee...57274) |
| 1.000175 | $297.85 | $19593.39590 | $19990.00 | Bought 19589.967654 USDT for 19990 USD using Cash (USD) |
| $1.00 | $10.00 | $19990.00 | $20000.00 | Deposit from Smart Financial Credit Union:****5580 |

3. SEPTEMBER 2022:

**Portfolio Summary**

| Asset | Quantity | Market Price | Market Value |
|---|---|---|---|
| USD | 7090<br>as of 2022-09-30 23:59:59 UTC | 1.00000000 USD/USD<br>as of 2022-09-30 23:59:00 UTC | 7090 USD<br>as of 2022-09-30 23:59:00 UTC |

Total Market Value
7090 USD

**4. OCTOBER 2022: $8,000.00**

| action | Fees | Subtotal | Total [1] | Notes |
|---|---|---|---|---|
| $0.08195 | $0.00 | $1.00 | $1.00 | Received 12.2025625381330079 GRT from Coinbase as a learning reward |
| ,20077.365 | $0.00 | $4.99946 | $4.99946 | Received 0.00024901 BTC |
| $1.000035 | $0.00 | -$6949.40 | -$6949.40 | Sent 6949.15678 USDT to 0xF79A8dD075FB5dE850a05f5340f445d7949D49AF (to 0xF79...D49AF) |
| $1.000035 | $105.64 | $6949.40345 | $7090.00 | Bought 6949.160234 USDT for 7090 USD using Cash (USD) |

**The above recipient wallets ("deposit address") have missing digits, they are truncated. Plaintiff has identified two of the three wallets as:**

a. **0x0Ee4F8E92C23572f7a94Ff9981EAFCbe02d57274**

b. **0xB7953a72b8e00aC17af6E545C5966A39c93370d4**

c. **Still needed: address ending in … D49AF**

Once Plaintiff made clear that she would not be "investing" any additional funds, the Enterprise shut down its active operation against her. The warm, fluent, native-English communications characteristic of the Tier 1 grooming operatives ceased. In their place, Plaintiff began receiving sporadic, emotionally detached messages from Tier 2-4 ESL operatives whose syntax reflected Asian language structure—distinctly different from the earlier native-English conversationalists.

This abrupt shift was intentional. By withdrawing the Tier 1 persona and replacing it with distant Tier 2–4 communicators, the Enterprise sought to keep Plaintiff minimally engaged while preventing her from contacting Coinbase or taking protective action. During this period, Defendants retained full control over the DBEX "exchange" and used the manufactured "waiting period" to launder Plaintiff's funds through a coordinated sequence of offshore wallets, mixers, and exchanges.

**D. Other Victims**

Plaintiff has identified at least two others who were Enterprise victims. The first is "Victim 1" is referenced in the forfeiture complaint in the forfeiture case *United States of America v. 12,324.84 USDT Seized from Binance.com*, Action No. 1:23-cv-02549-SBP against defendants Duean Phikunaew, Varat Vitthayanuwat, Wang Xuewen and Jiang Changesen was taken for $1,275,201 USD having been initially targeted in September 2022. This is the forfeiture action filed by the DOJ involving funds fraudulently acquired through the DBEX platform. **Victim 1 invested over $100,000 as she was approached through Airbnb and groomed by a man using a more standard script -- portraying himself as King Chen Yu, a cryptocurrency trader on**

**an investment platform called DBEX**. ***See* Exhibit A, p. 7,¶24.** The introduction is significant, as it would be more of a standard scam script than the complex "Olafur" story and narrative used against Plaintiff, which has indicators of a more personal story narrative.

The **"Olafur" persona also made contact in Washington State through Airbnb**, through tactics almost identical to those used on Plaintiff. "Olafur" represented himself to this victim in or about September 2022, as a potential guest who invests money in cryptocurrency who wanted to rent her property and was looking for an investment property. "Olafur" spoke to this host-victim about investing in cryptocurrency. The **host invested app. $100,000 in USDT (Tether) moving from Crypto.com to the DBEX** app. Similar to Plaintiff's situation, when she went to withdraw her funds a DBEX customer service representative told her the app was down for upgrades, and that it was locked until she provided additional information and an additional deposit of $115,000, to unlock her account.

Interestingly, J.R. lived with his family in both the Houston and Seattle metropolitan areas during his father's NFL career, making these locations natural points of affinity if he is, in fact, the Enterprise Tier 1 Operator acting as "Olafur". This family history would explain J.R.'s affinity for targeting Houston and Washington State Airbnb hosts.

## E. The Handoff from Tier 1 to Tiers 1-3, and the Stalling Period

After Plaintiff's funds were transferred, Defendants abruptly shifted tone and began offering implausible excuses for delays, including claims that they were traveling to Houston and would see Plaintiff October 17-18, 2026 ("Stalling Period"). These statements were false and intended only to stall Plaintiff while the Enterprise laundered and distributed Plaintiff's funds.

During the stalling period when the Enterprise wanted to keep Plaintiff engaged while it had opportunity to launder Plaintiff's money, Defendant J.R. posted publicly on social media that

he had flown with family and his partner to the Bahamas (his mother, sister and her spouse and children). Upon information and belief, these trips would have occurred when or shortly after Tier 1 Domestic Actor Defendant(s) received their portion of the laundered proceeds. Presumably, these were the fruits of the "steal" against Plaintiff.

## F. Emotional Manipulation and Harm

Throughout the scheme, Enterprise Defendants engaged in sustained emotional manipulation, including false promises of travel, companionship, and future plans. To realize she had been scammed has caused Plaintiff severe emotional distress, anxiety, humiliation, and financial devastation. **A Tier 1 actor with a psychology degree and acting experience** would be a tremendous asset to such an Enterprise, as he or she would be capable of intense emotional manipulation aPnd persuasion, making the victim ultimately feel more manipulated and exposed. This makes a victim, such as Plaintiff, feel the harm was even more deliberate, more targeted, and less random.[12]

On of the initial "hooks" by "Olafur" was after he realized Plaintiff was an attorney, was when he determined Plaintiff was an attorney and would have affinity to professional attire. "Olafur" was right on the money (no pun intended) -- the following picture elicited a positive response from Plaintiff:

[12] At one point, "Olafur" found out that Plaintiff had read the book "Love Languages" and asked Plaintiff what hers were. This was obviously information used against her in subsequent communications, and caused Plaintiff great distress upon realizing she had volunteered information that was directly used in the steal and consequential destruction in her life experience and finances.


10:06
+1 (570) 500-5820
online
9:51 PM
Thank you Olaf, yes absolutely clothes styles change a woman and anyone really. Men too.
9:52 PM
You
Photo
Haha you are so cute
9:53 PM
9:55 PM

*And so on* -- on and on it went for 397 single space typewritten pages worth (printed from Whats App) while Enterprise Defendants cajoled and hoped they could get further funds from Plaintiff.

## G. Shutdown of DBEX

After laundering Plaintiff's funds, Tier 2 Asian Actor Defendants shut Plaintiff out of the DBEX platform, terminated access to Plaintiff's account after "Olafur's" seeking to persuade her to deposit more money failed, and eventually disappeared.

DBEX was originally registered by a California registrar. However, about a year or more after the Enterprise against Plaintiff ended, Plaintiff received some sort of notification bout DBEX on her computer and had her IT assistant reverse "ping" to the server. Shortly after that, the website was transferred to France and put on the market for sale.

## H. Consequences and Damages

Plaintiff realleges and incorporates all preceding paragraphs.

Defendants engaged in extreme and outrageous conduct that exceeded all possible bounds of decency in a civilized society. Through coordinated deception, emotional manipulation, and intentional exploitation, Defendants induced Plaintiff to trust and rely upon fabricated personal relationships, false promises of companionship, and fraudulent representations of financial opportunity. Defendants deliberately cultivated emotional dependence and used sustained psychological manipulation to coerce Plaintiff into transferring her entire life savings into the enterprise's cryptocurrency accounts.

"Olafur" -- representing the Enterprise -- ***guaranteed* that Plaintiff could make over $1 million in profit.** *See* What's App Chat P-001, pp. 184 & 193 & 213 & 233. Plaintiff intends to

hold "Olafur" and all Enterprise members to that guarantee. "Olafur" repeatedly represented it was "absolutely safe" to put funds "into our encrypted account!". *See* What's App Chat, at 219.

**Defendants' conduct was intentional, malicious, and undertaken with reckless disregard for the predictable and severe emotional harm it would cause.** Defendants knew or should have known that Plaintiff relied on her savings to support herself and her family, including a disabled veteran sibling who depended on Plaintiff for essential care, housing stability, and financial support. Defendants also knew or should have known that the sudden loss of Plaintiff's savings would cause extreme emotional distress, financial devastation, and long-term psychological injury. *See* Whats App chat, at 222. When Plaintiff was defrauded, then realized that she could have affected family assets and home, **Plaintiff was devastated. "Olafur" was attempting to steal Plaintiff's family's only remaining home (after being informed Plaintiff had lost hers to Hurricane Harvey in 2017)! This shows the cruelty of the Enterprise's plan and their indifference to the the devastation caused to victims such as Plaintiff.**

As a direct result of Defendants' conduct, Plaintiff suffered severe emotional distress, including anxiety, humiliation, fear, and prolonged psychological trauma. The emotional shock and stress inflicted by Defendants' actions caused Plaintiff's cancer—previously in remission for over seventeen years—to resurge violently, resulting in significant physical suffering, medical disruption and expense, and fear for her life. Plaintiff's emotional and physical injuries were foreseeable consequences of Defendants' intentional and outrageous conduct. Moreover, Plaintiff's resulting physical condition has precluded prolonged and regular employment, resulting in significant loss of income.

**"Olafur's'" conduct constituted psychological and emotional abuse**, as "Olafur" employed deliberate emotional manipulation, identity-based deception, and coercive trust-building

techniques to influence Plaintiff's perceptions and decisions, ultimately facilitating the fraudulent scheme. **"Olafur" would ask such questions as "Do you believe I was sent by God, Diana?" playing on her faith. He used deliberate emotional manipulation to gain trust, he exploited Plaintiff's empathy and personal disclosures -- all designed to manipulate her perception.** All with intermittent reinforcement -- a hallmark of emotional abuse. He used guilt, pressure and emotional framing to influence her decisions, and he used deception to induce financial harm. This was done with malice and foresight, knowing the devastation Plaintiff that it would cause.

Defendants' actions constitute intentional infliction of emotional distress under Texas law. Plaintiff seeks compensatory damages for emotional and physical harm and lost income, punitive damages sufficient to punish Defendants and deter similar conduct, and all other relief available under law. Plaintiff is entitled to treble damages, attorney's fees, lost income and costs under 18 U.S.C. § 1964(c).

## CAUSES OF ACTION

### AIRBNB

### I.
### Breach of Contract
### (Against Airbnb)

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Airbnb, Inc. entered into a binding Terms of Service agreement with Plaintiff, expressly representing that its platform operated as a "trusted community," provided a "secure booking environment," and employed identity-verification protections designed to ensure safe interactions between hosts and guests. Airbnb further represented that it utilized verification tools, safety protocols, and fraud-prevention systems to protect users from harm. Most critically, Plaintiff relied on Airbnb's assurances that guests were vetted through government-issued identification for both

inquiries and reservations. The requirement of government identification is the very safeguard that signals a vetted, legitimate guest and forms the foundation of a safe and reliable hosting experience.

Airbnb breached the contract by failing to provide the safety features and verification systems it expressly represented for all inquiries, not just guests once a reservation is made. Airbnb allowed an unverified, anonymous individual ("Olafur") to initiate contact with Plaintiff without government-issued identification, without any verified identity information, and without disclosing to Plaintiff that the inquiry came from an unverified user. Airbnb concealed the absence of verification and failed to enforce its own guest safety protocols for inquiries directly to hosts such as Plaintiff.

Airbnb's contractual omissions and failures were a producing cause of Plaintiff's damages. Plaintiff relied on Airbnb's contractual promises of safety and verification when approached by "Olafur" for a Whats App exchange. Had she realized that Airbnb had not required "Olafur's" government ID before he initiated contact, she would have never attempted to speak to him directly. As a result of Airbnb's breach, Plaintiff's confidence in "Olafur's" reliability and intent was misplaced, and Plaintiff suffered substantial financial losses and consequential damages as a result of "Olafur's" contact through the Airbnb platform.

Plaintiff seeks actual damages, consequential damages, benefit-of-the-bargain damages, and all other relief permitted under Texas law.

## II.

## Fraudulent Concealment -
## Independent Tolling Doctrine
## (Against Airbnb)

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Separately, Airbnb's conduct constitutes **fraudulent concealment**, which independently tolls limitations. Under Texas law, fraudulent concealment tolls the statute of limitations when a defendant (1) has actual knowledge of the wrong, (2) conceals material facts, and (3) thereby prevents the plaintiff from discovering the cause of action despite reasonable diligence. *S.V. v. R.V.*, 933 S.W.2d 1 (Tex. 1996).

Airbnb knew that its platform permitted anonymous inquiries, lacked mandatory government-ID verification, yet concealed inquirers verification status from hosts. Airbnb further knew that its public safety representations were inconsistent with its actual practices. Airbnb's omissions and concealment prevented Plaintiff from discovering the true nature of Airbnb's verification failures until **late October 2022**.

Under Texas Supreme Court precedent, fraudulent concealment tolls limitations until the plaintiff actually discovers the concealed facts. Plaintiff discovered Airbnb's concealed omissions after October 2022**, making all fraud-based claims timely under the** four-year statute of limitations in Tex. Civ. Prac. & Rem. Code §16.004(a)(4).

## III.

## DTPA Violation - Statutory Discovery Rule + Fraudulent Concealment (Against Airbnb)

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Texas Business & Commerce Code §17.565 provides that a DTPA claim accrues when the consumer **discovered or should have discovered** the deceptive act. Plaintiff was as diligent as any other host, however had never experienced a fraud event like this one, before. Accordingly, she did not realize even from her initial review of Airbnb policies -- which failed to explain that inquiring individuals were not required to provide government identification, the danger when

"Olafur" contacted her. Plaintiff only discovered Airbnb's deceptive omissions after October 2022, when she was trying to understand how this all went so terribly wrong.

Airbnb engaged in false, misleading, and deceptive acts and practices in violation of Texas Business & Commerce Code §17.46(b). Airbnb represented that its platform provided a "trusted community," a "secure booking environment," and identity-verification protections designed to ensure safe interactions between hosts and guests. Airbnb further represented that it employed verification tools, safety protocols, and fraud-prevention systems to protect users from harm. These representations were false, misleading, and deceptive because Airbnb allowed anonymous inquiries, did not require government-issued identification for users making inquiries, concealed the absence of verification, and failed to disclose that those inquiring had no verified identity information until they actually reserved a booking. These statements fall under Tex. Bus. & Com. Code §§17.46(b)(5) (misrepresenting characteristics), 17.46(b)(7) (misrepresenting quality), 17.46(b)(24) (failing to disclose) and 17.50(a)(2) (breach of express warranty).

Additionally, all Defendants' fraudulent concealment tolls the statute of limitations period against Plaintiff's claims against Airbnb. Texas courts apply fraudulent concealment to DTPA claims when the defendant's deception prevents discovery of the wrongful conduct. *See Borderlon v. Peck, 661 S.W.2d 907 (Tex. 1983).* (a defendant who conceals and does not disclose wrongdoing cannot rely on the statute of limitations until the plaintiff discovers the fraud). Airbnb's concealment of its verification failures, anonymous inquiry practices, and misleading safety representations prevented Plaintiff from discovering the deception until **late October 2022**. Accordingly, Plaintiff's claims are timely under both the statutory discovery rule and the fraudulent-concealment doctrine. The Enterprise Defendants have obviously concealed their identities and wrongdoing and continue to do so.

Airbnb's deceptive acts were a producing and proximate cause of Plaintiff's damages. Plaintiff relied on Airbnb's safety representations when responding to the inquiry from the individual using the alias "Olafur," believing that Airbnb had vetted the user through government-issued identification and verification protocols.

## IV.

## Negligent Platform Design / Failure to Implement Reasonable Safety Measures (Against Airbnb)

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Airbnb owed a duty to design and operate its platform in a reasonably safe manner, including implementing identity-verification protocols sufficient to prevent foreseeable criminal misuse. Airbnb breached this duty by permitting inquiries from unverified individuals, failing to require government-issued identification unless and until a reservation was made, and failing to implement reasonable safeguards to prevent anonymous actors from contacting users. Plaintiff was contacted by "Olafur" through Airbnb, attempted to vet him, and was instead contacted through WhatsApp. Airbnb later admitted to Plaintiff that it did not possess any verified identity information for "Olafur." Airbnb's inadequate platform design and failure to implement reasonable safety measures were a proximate cause of Plaintiff's injuries. Plaintiff seeks all damages available under Texas law.

## V.

## Market Defect / Information Defect (Against Airbnb)

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Airbnb placed its platform into the stream of commerce with an information defect because it failed to provide adequate warnings regarding the risks associated with interacting with

unverified individuals. Airbnb represented its platform as safe and supported by identity-verification tools, yet did not disclose that government-issued identification was not required for inquiries and that individuals could initiate contact anonymously. Airbnb's failure to warn of this material risk rendered its platform unreasonably dangerous for its intended and foreseeable use. Plaintiff relied on Airbnb's safety representations when responding to "Olafur's" inquiry and suffered injury as a direct and proximate result of Airbnb's failure to provide adequate warnings. Airbnb's omissions were a substantial factor in causing Plaintiff's damages.

## VI.
## Common Law Fraud
## (Intentional Misrepresentation)
## (All Enterprise Defendants)

Plaintiff incorporates all preceding allegations as though fully set forth herein.

The individuals operating under the alias "Olafur" knowingly made false, material representations to Plaintiff regarding the DBEX trading platform, including repeatedly saying to get Plaintiff, ***"I guarantee you will make $1 million in one month."*** These statements were false when made, and the perpetrator knew they were false or made them recklessly knowing they were not true. The representations were made for the purpose of inducing Plaintiff to purchase USDT and transfer it to DBEX wallets, and Plaintiff reasonably relied on them, resulting in the loss of not only of her $124,058.66.130 USDT transferred but of the $1,000,000 profit guaranteed.

**Airbnb, Inc.** is liable for fraud by omission because its platform-safety representations created a false impression that "Olafur" was a verified, identifiable user. Airbnb allowed an anonymous individual to contact Plaintiff without any identity verification, failed to disclose that it possessed no identifying information for "Olafur," and represented its platform as safe and vetted. These omissions were material, induced Plaintiff's reliance, and directly enabled the fraudulent misrepresentations to occur.

Plaintiff is entitled to **benefit-of-the-bargain damages**, including the $1,000,000 guaranteed profit, actual damages, consequential damages, and exemplary damages under Texas law.

**VII.**
**Breach of Warranty**
***(Tex. Bus. & Com. Code §2.313 et seq.)***
**(Against Airbnb)**

Airbnb expressly warranted to consumers that its platform provides a safe, secure, and trustworthy booking environment; that it verifies host identities; and that it maintains safety protections designed to prevent fraudulent activity. *See* Airbnb 2022 Winter Release - Airbnb Newsroom, November 16, 2022. Airbnb's major identity-verification expansion occurred late 2022. *See* Airbnb, Inc., *"Airbnb 2022 Winter Release,"* Airbnb Newsroom, https://news.airbnb.com/airbnb-2022-winter-release/ (news.airbnb.com in Bing) (last visited October 15, 2026). Before late 2022, Airbnb did not require government ID for all guests or inquiries -- which is exactly the gap this lawsuit relies upon. Changes were made after 2022, and an update on Identity Verification on Airbnb - Airbnb Newsroom now represents that identity verification reduces fraudulent behavior. *Airbnb, Inc., "An Update on Identity Verification on Airbnb," Airbnb Newsroom,* https://news.airbnb.com/an-update-on-identity-verification-on-airbnb/ *(news.airbnb.com in Bing)* (last visited Oct. 15, 2026).

These representations constitute express warranties regarding the quality, reliability, and future performance of Airbnb's services. Airbnb breached these warranties by failing to implement or enforce the safety, verification, and fraud-prevention measures it represented to users. Airbnb's platform permitted an unverified, fraudulent host profile to operate and interact with Plaintiff, exposing her to the Enterprise Defendants' scheme. Airbnb's breach was the **proximate cause** of

Plaintiff's damages, including financial losses, consequential harms, and reasonable investigative expenses incurred to identify the perpetrators and trace the stolen funds.

This claim is timely under the **four-year statute of limitations** applicable to breach-of-warranty actions, **Tex. Bus. & Com. Code § 2.725. Limitations is further tolled under the doctrines of fraudulent concealment and the discovery rule** because Airbnb concealed the defects in its safety, verification, and fraud-prevention representations, and Plaintiff could not have discovered the breach until the fraudulent scheme was revealed in late 2022 despite reasonable diligence. Plaintiff seeks all damages permitted under Texas law, including economic damages, consequential damages, and investigative expenses necessary for this litigation.

## VIII.
## Texas Theft Liability Act
## (Against Enterprise Defendants)

Plaintiff brings this claim under the Texas Theft Liability Act ("TTLA"), Tex. Civ. Prac. & Rem. Code § 134.001 et seq., against the Enterprise Defendants. These Defendants knowingly appropriated Plaintiff's property without consent and with intent to deprive her of that property, in violation of Texas Penal Code § 31.03. The Enterprise Defendants received, transferred, concealed, and benefited from Plaintiff's stolen DBEX deposits through coordinated wallet activity and digital-asset movements consistent with organized theft.

Plaintiff suffered actual damages as a result of this unlawful appropriation and seeks recovery of all losses permitted under § 134.005, including actual damages, court costs, reasonable attorney's fees, and exemplary damages where the theft was committed knowingly. **Plaintiff also seeks recovery of reasonable and necessary investigative expenses—including blockchain-tracing and forensic-analysis costs**—required to identify the Enterprise participants and trace the stolen funds. **Limitations for this claim is tolled under the doctrines of fraudulent**

**concealment and the discovery rule because Defendants concealed both their identities and the nature of the theft, preventing Plaintiff from discovering the wrongdoers despite reasonable diligence.**

## IX.
## Fraud
## *(Tex. Civ. Prac & Rem. Code §16.004(a)(4))*
## (All Enterprise Defendants)

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Defendants knowingly made false representations of material fact and omissions, including concealing their true identities, the true nature of their purported business activities, and the legitimacy and profitability of the DBEX cryptocurrency trading/investment platform. Defendants intended Plaintiff to rely on these misrepresentations, and Plaintiff did reasonably rely on them by transferring approximately $132,000 into DBEX-controlled wallets. Defendants' false statements and omissions directly and proximately caused Plaintiff's financial losses and other damages.

## X.
## Fraudulent Inducement
## (All Enterprise Defendants)

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Defendants induced Plaintiff to enter into transactions and transfer funds by falsely representing that DBEX was a legitimate investment platform capable of generating extraordinary returns. Defendants' misrepresentations were made knowingly and with the intent to deceive. Plaintiff relied on these inducements when liquidating assets and transferring funds, resulting in substantial damages.

## XI.
## Civil Conspiracy

**(All Enterprise Defendants)**

Plaintiff incorporates all preceding allegations as thought fully set forth herein.

Tier 1 Domestic Actors and Tier 2 Asian Actors agreed and acted in concert to defraud Plaintiff and other victims. Each Defendant committed overt acts in furtherance of the conspiracy, including grooming communications, manipulation of the DBEXIT interface, and laundering of stolen funds. Plaintiff suffered damages as a direct and proximate result of the conspiratorial conduct.

## XII.
## Aiding and Abetting Fraud
**(All Enterprise Defendants)**

Plaintiff incorporates all preceding allegations as thought fully set forth herein.

Each Enterprise Defendant knowingly assisted and encouraged the fraudulent scheme. Tier 1 actors groomed Plaintiff and induced transfers, while Tier 2-4 actors controlled DBEX, fabricated trading results, and laundered proceeds. Defendants' substantial assistance enabled the fraud to occur and directly caused Plaintiff's losses.

## XIII.
## RICO – 18 U.S.C. § 1962(c)
***(Racketeer Influenced and Corrupt Organizations Act)***
**(All Enterprise Defendants)**

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Defendants conducted and participated in an enterprise engaged in interstate and foreign commerce through a pattern of racketeering activity, including wire fraud, money laundering, and other predicate acts defined in 18 U.S.C. § 1961(1). Defendants' coordinated actions constitute at least two predicate acts within ten years. Plaintiff was injured in her business or property by reason of Defendants' RICO violations and seeks treble damages under 18 U.S.C. § 1964(c).

**XIV.**
**RICO Conspiracy – 18 U.S.C. § 1962(d)**
**(All Enterprise Defendants)**

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Defendants knowingly agreed to participate in the RICO enterprise and to commit the predicate acts described above. Each Defendant joined the conspiracy with knowledge of its unlawful purpose. Plaintiff suffered injury to her business or property as a result of overt acts committed in furtherance of the conspiracy.

**XV.**
**Money Had and Received**
**(All Enterprise Defendants)**

Plaintiff incorporates all preceding allegations as though fully set forth herein. Defendants hold money that in equity and good conscience belongs to Plaintiff. Plaintiff transferred funds under false pretenses, and Defendants retained and used those funds for their own benefit. Equity requires restitution of all amounts wrongfully obtained.

**XVI.**
**Conversion**
**(All Enterprise Defendants)**

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Plaintiff owned and had the right to possess the funds transferred through Coinbase and deposited into DBEXIT wallets. Defendants wrongfully exercised dominion and control over those funds, depriving Plaintiff of their use and value. Defendants' conduct constitutes conversion, and Plaintiff seeks recovery of all converted amounts and consequential damages.

**XVII**
**Texas Theft Liability Act**
***(Tex. Civ. Prac. & Rem. Code § 134.001 et seq.)***
**(All Enterprise Defendants)**

Plaintiff incorporates all preceding allegations as though fully set forth herein.

Defendants unlawfully appropriated Plaintiff's property with intent to deprive her of its value, in violation of Texas Penal Code § 31.03. Plaintiff is entitled to civil remedies under the Texas Theft Liability Act, including actual damages, court costs, reasonable attorney's fees, and **up to treble damages** as permitted by statute.

Defendants engaged in extreme and outrageous conduct by manipulating Plaintiff emotionally, fabricating personal relationships, and inducing her to liquidate all assets possible under false pretenses. Defendants deliberately cultivated emotional dependence and used sustained psychological manipulation to coerce Plaintiff into transferring her entire life savings into the enterprise's cryptocurrency accounts. Defendants acted intentionally or with reckless disregard for the severity of damage it would cause Plaintiff and family who depended upon her.

Defendants' conduct was intentional, malicious, and undertaken with reckless disregard for the predictable and severe emotional harm it would cause Plaintiff. Defendants knew or should have known that Plaintiff relied on her savings to support herself and her family, including a disabled veteran sibling who depended on Plaintiff for essential care, housing stability, and financial support. Defendants also knew or should have known that the sudden loss of Plaintiff's savings would cause extreme emotional distress, financial devastation, and long-term psychological injury.

As a direct result of Defendants' conduct, Plaintiff suffered severe emotional distress, including anxiety, humiliation, fear, and prolonged psychological trauma. The emotional shock

and stress inflicted by Defendants' actions caused Plaintiff to abandon self-care and work extraordinarily long hours to financially regain her footing such that her cancer—previously in remission for seventeen years — began to resurge to massive proportion, resulting in significant physical suffering through months of chemotherapy and adverse medications, medical disruption, and fear for her financial viability and life. Plaintiff's emotional and physical injuries were foreseeable consequences of Defendants' intentional and outrageous conduct, which constitute intentional infliction of emotional distress under Texas law. Plaintiff seeks compensatory damages for emotional and physical harm, punitive damages sufficient to punish Defendants and deter similar conduct, and all other relief available under law.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and award the following relief:

1. **Compensatory Damages.** An award of compensatory damages in an amount to be determined at trial, including but not limited to:

• the full value of Plaintiff's lost funds ($132,000), • the value of the promised investment returns (approximately $1,000,000),

• damages for emotional distress, anxiety, humiliation, and psychological harm, • damages for the financial devastation caused by the loss of Plaintiff's entire savings, including medical and medical-related travel expenses associated with the recurrence and resurgence of Plaintiff's cancer after seventeen or more years of remission,

• **lost income from November 2022 through the present, calculated at approximately $220,000 per year,**

• damages for harm to Plaintiff's ability to support family members, including a disabled veteran sister,

• **all reasonable and necessary investigative and tracing expenses**, including blockchain-tracing, forensic analysis, digital-asset tracking, and identity-verification research required to identify the Enterprise Defendants and trace the stolen funds.

2. **Treble Damages Under RICO. Treble damages** pursuant to 18 U.S.C. § 1964(c) for Defendants' participation in a racketeering enterprise involving wire fraud, money laundering, aiding and abetting fraud, and coordinated fraudulent activity.

3. **Benefit-of-the-Bargain Damages. $132,000 in lost principal plus $1,000,000 in guaranteed investment returns** promised by the Enterprise Defendants as part of the fraudulent DBEX trading scheme.

4. **Punitive/Exemplary Damages.** Plaintiff seeks punitive damages sufficient to punish Defendants and deter similar misconduct, up to the maximum permitted by Texas law. Plaintiff's economic damages exceed $2,000,000—including **$132,000 in lost funds, the guaranteed $1,000,000 investment return, lost income of approximately $220,000 per year for at least four years, and medical and travel expenses** associated with the resurgence of Plaintiff's cancer. Under Tex. Civ. Prac. & Rem. Code § 41.008, exemplary damages are capped at two times Plaintiff's economic damages plus up to $750,000 in non-economic damages, entitling Plaintiff to approximately **$4,750,000** in exemplary damages at the time of trial.

5. **Texas Theft Liability Act Damages.** All damages available under the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code § 134.005, including actual damages, court costs, reasonable attorney's fees, exemplary damages for knowing theft, and **investigative expenses** required to trace and recover stolen assets. Limitations are tolled under fraudulent concealment and the discovery rule.

6. **DTPA Damages.** All remedies available under the Texas Deceptive Trade Practices–Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 et seq. Defendants' conduct was knowing and intentional, entitling Plaintiff to **treble damages** under § 17.50(b)(1). Plaintiff further seeks economic damages, mental-anguish damages, exemplary damages, attorney's fees, court costs, pre- and post-judgment interest, and any additional relief authorized by the DTPA or Texas law.

7. **Breach of Warranty Damages (Airbnb).** All damages recoverable under Tex. Bus. & Com. Code § 2.313 et seq., including economic damages, consequential damages, and all reasonable investigative expenses arising from Airbnb's breach of express warranties regarding platform safety, identity verification, fraud-prevention protections, and future performance. Limitations are tolled under the discovery rule and fraudulent concealment.

8. **Fraud, Negligent Misrepresentation, and Aiding-and-Abetting Damages.** All damages recoverable under Texas law for fraud, negligent misrepresentation, and aiding and abetting fraud, including economic losses, consequential damages, mental-anguish damages, and punitive damages.

9. **Attorney's Fees and Costs.** An award of reasonable attorney's fees, expert fees, and litigation costs pursuant to federal and state law, including RICO, TTLA, DTPA, and all other applicable statutes.

10. **Pre-Judgment and Post-Judgment Interest.** Interest at the maximum rate permitted by law. Tex. Fin. Code § 302.001(b).

11. **Equitable Relief.** Any equitable, injunctive, or declaratory relief the Court deems just and proper, including orders facilitating **asset tracing**, **disgorgement**, **restitution**, **constructive trust**, and **injunctive relief** preventing further fraudulent conduct.

12. **Additional Relief.** Any further relief the Court finds appropriate in light of the egregious, intentional, malicious, and life-threatening nature of Defendants' conduct.

## CONCLUSION

WHEREFORE, Plaintiff respectfully asserts that Defendants' conduct caused direct, foreseeable, and compensable harm. Plaintiff has plead detailed factual allegations supporting each cause of action demonstrating both liability and damages. Accordingly, Plaintiff requests that judgment be entered in Plaintiffs' favor on all claims, award all damages permitted by law, impose appropriate equitable relief, and grant any further relief the Court deems just and proper.

Dated: October 16, 2026.

Respectfully submitted,

Diana R. Miller
Plaintiff, Pro Se
526 Kingwood Drive #134
Kingwood, TX 77339
Email: dmiller@miller.legal
Phone: 346-600-4703